*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0020p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 05-6412/6415/6416

NORMAN T. SEXTON (05-6412); RICHARD ROMANS (05-6415); JAMES ALBERT LEGG (05-6416),

*Defendants-Appellants.*

>

---

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 99-00071—Curtis L. Collier, Chief District Judge.

Argued: October 25, 2007

Decided and Filed: January 11, 2008

Before: MERRITT, ROGERS, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Stephen T. Greer, Dunlap, Tennessee, Marshall A. Raines, SWAFFORD, JENKINS & RAINES, Jasper, Tennessee, Clayton M. Whittaker, MACK & WHITTAKER, Chattanooga, Tennessee, for Appellants. Gregg L. Sullivan, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Stephen T. Greer, Dunlap, Tennessee, Marshall A. Raines, SWAFFORD, JENKINS & RAINES, Jasper, Tennessee, Clayton M. Whittaker, MACK & WHITTAKER, Chattanooga, Tennessee, for Appellants. Gregg L. Sullivan, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

ROGERS, J., delivered the opinion of the court, in which MCKEAGUE, J., joined. MERRITT, J. (pp. 7-11), delivered a separate dissenting opinion.

---

## OPINION

---

ROGERS, Circuit Judge. Defendants Norman T. Sexton, Richard Romans, and James A. Legg challenge the sentences imposed by the district court on remand from this court for resentencing in light of *United States v. Booker*, 543 U.S. 220 (2005). Defendants were sentenced in 2002 after being convicted of offenses stemming from the distribution of cocaine. After the Supreme Court's decision in *Booker*, this court entered an order vacating the sentences of all three

1

defendants and remanding their cases for resentencing.  On remand, the district court reimposed identical sentences.

Defendants make five primary arguments on appeal: (1) the district court violated their Sixth Amendment and due process rights by using its own factual findings to calculate their sentencing ranges under the United States Sentencing Guidelines; (2) their sentences exceeded the "maximum statutory sentence" allowable for their offenses; (3) the imposition of their sentences in accordance with the remedial portion of *Booker* created an unconstitutional ex post facto effect; (4) Sexton's sentence was unreasonable; and (5) the district court's refusal to order the preparation of new presentencing reports on remand was improper under Fed. R. Crim. P. 32.  Because all of these arguments are without merit, we affirm the sentences imposed by the district court.

I.

On December 20, 2000, a jury found all three defendants guilty of conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and found defendants Romans and Legg guilty of distributing cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  The presentencing reports (PSRs) prepared for defendants provided Sentencing Guidelines ranges of 235 to 240 months for Sexton, 210 to 240 months for Legg, and 151 to 188 months for Romans.  The PSRs attributed 15.05, 13.69, and 5.86 kilograms of cocaine to Sexton, Legg, and Romans, respectively, for purposes of calculating their base offense levels.  Pursuant to U.S.S.G. § 3B1.1, the PSRs also recommended enhancing all three defendants' base offense levels because of their roles in the offense.  Legg's offense level was also increased under U.S.S.G. § 2D1.1(b)(1) for his possession of a firearm in connection with the offense.  Both the drug quantity and sentencing  enhancement determinations made in defendants' PSRs were based upon testimony given at trial.

After examining the trial testimony, the district court adopted the findings of the PSRs with respect to the drug quantity attributable to each defendant and the application of § 3B1.1 role enhancements to the base offense levels of Sexton and Legg.  The court concluded, however, that a role enhancement was not warranted with regard to Romans and that a firearm enhancement was not warranted with regard to Legg.  Consequently, the district court determined that the proper Guidelines ranges for Sexton, Legg, and Romans were 235 to 240 months, 168 to 210 months, and 121 to 151 months, respectively.  On June 2, 2002, the district court sentenced Sexton to 238 months, Legg to 196 months, and Romans to 148 months of confinement.

Defendants appealed their sentences to this court, arguing that the use of judicial fact-finding to determine their respective drug amounts violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and that the district court erred in applying § 3B1.1 role enhancements.  In a decision filed on January 6, 2005, this court rejected defendants' claims, but noted that a case then pending before the Supreme Court, *United States v. Booker*, 543 U.S. 220 (2005), might affect their sentences.  Given that possibility, this court advised defendants that they could file a petition for rehearing if *Booker* did, indeed, have an impact on their sentences.  After the Supreme Court decided *Booker* on January 12, 2005, defendants petitioned this court for rehearing in light of that opinion.  This court subsequently entered an order vacating the sentences of all three defendants and remanding the case to the district court for resentencing.

Prior to their resentencing hearing, all three defendants filed motions arguing that *Booker* required the district court to order the preparation of new PSRs, which were to be based only upon facts that had been found by the jury beyond a reasonable doubt.  Defendants also renewed all of their prior objections to the PSRs.  The district court denied these motions because defendants failed to point out any factual inaccuracies in the PSRs or any legal authority for the proposition that facts used for sentencing purposes must be found by a jury. Further, with respect to defendants' renewed objections to the PSRs, the district court held that it was without authority to reopen prior sentencing

rulings, since the sole purpose of the remand was for the court to decide whether it would exercise its authority to vary from the Sentencing Guidelines.

Defendants were resentenced on September 1, 2005. At the outset, the district court reiterated that its only task was to determine whether it wished to exercise its new discretionary authority under *Booker* and that it "ha[d] no authority to revisit the guidelines." The district court then invited the parties to address the sentencing goals set forth in 18 U.S.C. § 3553(a). At this time, all three defendants objected again to the calculation of their Guidelines ranges using facts not found by a jury beyond a reasonable doubt. Defendants also took this opportunity to request that the sentencing court take into account their individual mitigating circumstances. Sexton, for instance, reminded the court of his good standing in the community, as evidenced by the number of persons attending his bond hearing, and the negative effect that the case was having on his family.

After listening to all of the parties, the district court imposed defendants' sentences. The district court began by noting that it understood the advisory nature of the Guidelines and that "in arriving at an appropriate sentence," it would consult the Guidelines as well as the sentencing goals enumerated in § 3553(a). While acknowledging that "the attorneys have spoken to those goals," the district court then listed and explained all four of the major § 3553(a) sentencing goals. After reciting those goals, the district court concluded that retribution and general deterrence were the most important goals in this case, given that defendants had committed drug trafficking crimes. Finally, the district court explicitly acknowledged each defendant's assertions as to his specific mitigating circumstances. "Taking into account all of these factors," the district court then imposed the same sentences that it had initially imposed.

## II.

The district court did not violate defendants' Sixth Amendment and due process rights by making factual findings, by a preponderance of the evidence, to determine defendants' sentencing ranges. As noted, the district court made its own factual determinations for sentencing purposes, based upon trial testimony, as to the quantity of cocaine attributable to each defendant and each defendant's role in the offense.

This court has squarely rejected defendants' contention that *Booker* and *Blakely v. Washington*, 542 U.S. 296 (2004), require all factual findings affecting a sentence's severity to be made by a jury beyond a reasonable doubt. In *United States v. Cook*, 453 F.3d 775, 777 (6th Cir. 2006), this court explained that "[*Booker*] has no bearing on advisory guideline calculations," but, instead, applies only to judicially found facts used "to impose a mandatory enhancement." Where, as here, a district court understands that the Guidelines are only advisory, judicial fact-finding done by the preponderance of the evidence is permissible. As we stated in *United States v. Mickens*, 453 F.3d 668, 673 (6th Cir. 2006) (collecting cases), "[b]y now, it is well established that the preponderance standard does not violate *Booker*, so long as the trial court appreciates that the guidelines are advisory, not binding." *See also United States v. Stone*, 432 F.3d 651, 654-55 (6th Cir. 2005) ("*Booker* did not eliminate judicial fact-finding"). Moreover, nothing in the Supreme Court's recent ruling in *Rita v. United States*, 127 S. Ct. 2456 (2007), changes our understanding.

## III.

Defendants' sentences also did not exceed the maximum statutory penalty that could be imposed for their offenses. In its normal use, the term "statutory maximum" simply describes the "upper limit of punishment that Congress has legislatively specified for violation of a statute." *United States v. Rubbo*, 396 F.3d 1330, 1334-35 (11th Cir. 2005). Pursuant to the statute under which defendants were convicted, each faced a maximum sentence of 240 months. 21 U.S.C. § 841(b)(1)(C). The district court sentenced Sexton, Legg, and Romans to 238, 196, and 148 months

of confinement, respectively.  Accordingly, none of the defendants were sentenced to a period exceeding the maximum statutory penalty.

Defendants argue that under *Blakely* and *Booker*, a crime's maximum penalty is the greatest sentence that a judge may impose under the Guidelines based upon facts admitted by a defendant or found by a jury.  As previously noted, defendants' sentences were calculated using drug amounts determined by the district judge.  The district court ultimately concluded for sentencing purposes that defendants were responsible for more cocaine than defendants were convicted of being responsible for under their offense definitions.  Thus, defendants assert that their sentences, even though less than 240 months, exceed the relevant "statutory maximum."

Since defendants were sentenced under an advisory Guidelines scheme, the maximum statutory penalty that the district court could impose was determined by the statute of conviction, rather than by a Guidelines range calculated using only jury findings.  Defendants appear to base their arguments upon the Supreme Court's statement in *Blakely* that "the 'statutory maximum' *for* Apprendi *purposes* is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  542 U.S. at 303 (emphasis added and omitted).  This court has explained, however, that *Blakely* defined the phrase "statutory maximum" only "for purposes of the *Apprendi* rule" and "did not change the meaning of that term (or equivalent terms) in other contexts."  *United States v. Phillips*, 143 F. App'x 667, 672 (6th Cir. 2005) ("the 'maximum statutory penalty' is not the same as the *Blakely* 'statutory maximum'").  Because defendants were sentenced under an advisory Guidelines scheme, which does not implicate *Apprendi* Sixth Amendment concerns, the *Blakely* definition is inapplicable here.  *See Booker*, 543 U.S. at 233 (holding that the use of an advisory Sentencing Guidelines scheme "would not implicate the Sixth Amendment").

## IV.

Furthermore, the application of the remedial portion of *Booker* to defendants' cases did not create an ex post facto effect in violation of defendants' due process rights.  Defendants claim that the application of *Booker*'s remedial holding created an ex post facto effect by allowing the district court to impose greater sentences on remand under the advisory Guidelines than it could have imposed at the time that they committed their crimes, when a mandatory Guidelines scheme was in place.  Defendants' arguments with respect to this issue are unavailing, as this court has held in multiple cases that the retroactive application of *Booker*'s remedial sentencing ruling does not lead to an ex post facto problem.  *See United States v. Hill*, 209 F. App'x 467, 468 (6th Cir. 2006); *United States v. Barton*, 455 F.3d 649, 652-57 (6th Cir. 2006); *United States v. Shepherd*, 453 F.3d 702, 705-06 (6th Cir. 2006).

## V.

Sexton's sentence was also not unreasonable.[1]  Sexton appears to assert that his sentence was unreasonable because the district court either did not consider his community standing or did not give it adequate weight.  The question of whether a sentence is reasonable is determined using the abuse-of-discretion standard of review.  *Gall v. United States*, No. 06-7949, 2007 WL 4292116, at *6 (U.S. Dec. 10, 2007).  Review for reasonableness has both procedural and substantive components.  *See id.* at *7; *United States v. Borho*, 485 F.3d 904, 908 (6th Cir. 2007).

The record indicates that the district court committed no significant procedural error with regard to Sexton's sentence.  The district court did not "fail[] to calculate (or improperly calculat[e])

---

[1]Romans also contends that his sentence was "unreasonable" because it was determined using judicially found facts.  As discussed, this argument is without merit.

the Guidelines range, treat[] the Guidelines as mandatory, fail[] to consider the § 3553(a) factors, select[] a sentence based on clearly erroneous facts, or fail[] to adequately explain the chosen sentence." *Gall*, 2007 WL 4292116, at *7. Here, the record demonstrates that the district court sufficiently considered and addressed the Guidelines, the § 3553(a) factors, as well as Sexton's mitigating circumstances in arriving at Sexton's sentence. The district court indicated that it was taking into account the properly calculated Guidelines ranges at several points during the resentencing hearing, which is supported by the fact that defendants were, indeed, sentenced within those ranges. The record also reveals that the district court understood the advisory nature of the Guidelines. Further, the district court recited and explained all of the § 3553(a) goals, stated that it had considered all of the goals, and then explained which sentencing goals it believed were the most relevant given that defendants were charged with drug trafficking offenses. Finally, the district court acknowledged that "Mr. Sexton's attorney made an argument regarding the particular characteristics of the defendant." While the district court could have provided a more thorough sentencing explanation, its reasoning is adequate to allow for reasonable appellate review. *See United States v. Williams*, 436 F.3d 706, 708-09 (6th Cir. 2006).

Sexton argues that the district court erred by not sufficiently considering his individual characteristics. During the sentencing hearing, Sexton asked the court to take into account his good standing in the community, which he argued was evidenced by the number of people attending his bond hearing, in arriving at his sentence. Although the district court did not state its reasons for rejecting this argument, it did not need to, given that the issue was simple and it was obvious that the court had considered his claim from the context and the court's explicit acknowledgment of the argument. Under *Rita*, a district court need not provide an explanation for rejecting a mitigating argument if "the matter is conceptually simple" and "the record makes clear that the sentencing judge considered the evidence and arguments." 127 S. Ct. at 2468-69; *see also United States v. Pettie*, 242 F. App'x 313, 317 (6th Cir. 2007) (stating that a district court need not discuss a type of "regular, recurring circumstance" during sentencing absent a showing of "exceptional hardship").

Likewise, Sexton's sentence is not substantively unreasonable. A sentence will be found to be substantively unreasonable "when the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *Borho*, 485 F.3d at 908 (quoting *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006)). Because Sexton's sentence is within a properly calculated Guidelines range, it is entitled to a presumption of reasonableness on review. *Williams*, 436 F.3d at 708. That presumption, of course, applies to the Guidelines range calculated by taking into account enhancements based on judge-determined facts.[2] Moreover, nothing in *Rita* precludes the application of the presumption to such a properly determined Guidelines range.

Sexton has not offered evidence sufficient to rebut the presumption of reasonableness and demonstrate that the district court abused its discretion. The only argument that Sexton appears to make is that the district court, in balancing the relevant §3553(a) factors, gave too little consideration to his personal characteristics and too much weight to retribution and general deterrence. It is reasonable, however, for the district court to have given significant weight to general deterrence and retribution when sentencing Sexton in light of the extent and duration of his drug trafficking. According to his PSR, Sexton was at the heart of a cocaine trafficking conspiracy involving multiple persons for at least five years. Considering the deleterious effect that such conduct would naturally have on a community, it was not unreasonable for the district court to give less weight to his personal characteristics. Because Sexton's argument ultimately boils down to an assertion that the district court should have balanced the § 3553(a) factors differently, it is "simply beyond the scope of our appellate review, which looks to whether the sentence is reasonable, as

---

[2]This case does not present an issue as to whether the *Rita* presumption applies to the Guidelines range with or without respect to departures under U.S.S.G. § 5K.

opposed to whether in the first instance we would have imposed the same sentence." *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006).

VI.

Finally, the district court did not abuse its discretion by declining to order the preparation of new PSRs on remand. Contrary to their assertions, defendants were not entitled to new PSRs under either Fed. R. Crim. P. 32 or 18 U.S.C. § 3553.[3] Defendants have not pointed to any authority interpreting Rule 32 or § 3553, which are silent on the matter, to require the creation of new PSRs on remand for *Booker* resentencing.

Moreover, as the district court noted, there was no need to prepare new PSRs in the instant action because the existing PSRs were factually accurate and complete. Defendants do not allege that their PSRs contained any inaccurate facts or omitted any relevant information with regard to their presentencing conduct. And, under this court's decision in *United States v. Keller*, 498 F.3d 316, 323-25 (6th Cir. 2007), the district court was not permitted to consider the defendants' post-sentencing conduct for purposes of *Booker* resentencing. This conclusion is supported by the decisions of courts in other circuits, which have similarly held that it is unnecessary to prepare new PSRs on remand where the parties receive an opportunity to be heard and no new information exists that would warrant an update. *See United States v. Alvarez-Cuevas*, 210 F. App'x 23, 24 (1st Cir. 2007) (holding that on remand for *Booker* resentencing, defendant was not entitled to the creation of a new PSR where defendant had not identified any new information not already considered by the judge); *United States v. Bezmalinovic*, 76 F. App'x 375, 377 (2d Cir. 2003); *United States v. Crank*, 21 F. App'x 521, 522-23 (8th Cir. 2001).

VII.

For the foregoing reasons, we AFFIRM the sentences imposed by the district court.

---

[3]Defendants' primary argument for the calculation of new PSRs is that the existing PSRs improperly calculated their Guidelines ranges to the extent that the PSRs relied on facts not determined by a jury. This argument, previously addressed, is contrary to well established law.

---

## DISSENT

---

MERRITT, Circuit Judge, dissenting. Except for those judges and lawyers who prefer to continue routine conformity to the old pre-*Blakely-Booker* process of guideline sentencing, there is widespread disapproval of the present muddled system. This is because, in the main, the old system is just continuing on as though nothing had happened — continuing under the pretext that the guidelines are only "advisory" instead of being considered only as a starting point against the backdrop of the more sensible and humane penalogical goals set out in § 3553(a), Title 18. This case is one more example of the continuing problem, the problem of guidelineism, or "guidelinitis," the inability of most federal courts to break their habit of mechanically relying just on the guidelines alone.

By ratcheting up the sentence, as is typical under the guidelines, piling aggravator on aggravator, the District Court, (as though *Booker* had never been decided), simply restored its old guideline sentences of 20 years in prison for Sexton, 16 years in prison for Legg, and 12 years in prison for Romans — all for a victimless drug crime.

Such harsh sentences are par for the course under the guidelines. The sentencing court imposed a harsh sentence without seriously considering mitigating family and personal factors or rehabilitation possibilities — all in line with the U.S. Sentencing Commission rules against the consideration of such individual factors in Chapters 5H and 5K of the Guidelines.[1] This refusal to seriously consider individual factors, including rehabilitation, has been the most important characteristic of the work of the Sentencing Commission. From the beginning, the guidelines have emphasized collectives, not individuals; and individualized sentencing by federal judges, the weighing of aggravators and mitigators through a process of dialectic reflection and reconciliation, has become a relic of the past. The creation of these guidelines involved the breakdown of behavior into smaller and smaller parts and categories of aggravators or enhancements without consideration of other important individual factors.

---

[1] The Commission's "not relevant" rule against consideration of a host of mitigating factors such as age, physical condition, education, employment, military, public service, good works, disadvantaged upbringing, addiction, mental illness, family ties, and rehabilitation possibilities are directly contrary to the Supreme Court's interpretation of the Eighth Amendment in *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), requiring states in sentencing to consider such mitigating factors. The Sentencing Commission, and now the federal courts at its direction, refuse to take into account the mitigating and humanizing factors that *Lockett* and *Eddings* require. There is no indication that any such factors were considered or influenced the sentence in this case.

The ratcheting-up process in the instant case was all based upon judicial findings of fact.[2] It is obvious to anyone who has watched this disingenuous process develop that the present system is completely inconsistent with the *Blakely* and *Booker* opinions, which confine judicial fact finding to those facts carrying out a jury verdict or plea of guilty. As the Court said in *Cunningham*, "under the Sixth Amendment, any fact that *exposes* a defendant to a greater *potential* sentence must be found by a jury, not a judge." *Cunningham v. California*, 127 S. Ct. 856, 863-64 (2007) (emphasis added). This statement of the Sixth Amendment rule was first stated in *Blakely* even more clearly and then repeated in *Booker* and *Rita*. It is still unclear, however, whether the Supreme Court is going to stay with or erode and then reject the clear holding of *Blakely*:

> [T]he '*statutory maximum' for Apprendi purposes* is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without any additional findings*. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority.

*Blakely v. Washington*, 542 U.S. 296, 303-04 (2005) (emphasis added). What is clear is that the district courts and the courts of appeals, as the majority in this case expressly acknowledges, are not applying this rule and do not believe the Supreme Court actually intends to enforce it. The view seems to be that the remedial opinion in *Booker* is inconsistent with this rule, and so the rule may be simply disregarded in practice.[3] Justice Scalia predicted such a result in *Booker*, noting that the Court's remedial scheme risked preserving "*de facto* mandatory guidelines by discouraging district courts from sentencing outside Guidelines ranges." *United States v. Booker*, 543 U.S. 220, 313 (2005) (Scalia, J., dissenting). Indeed, this *de facto*, mandatory application of the guidelines runs afoul of the Supreme Court's admonition that "*Booker*'s remedy for the Federal Guidelines . . . is not a recipe for rendering our Sixth Amendment case law toothless." *Cunningham v. California*, 127 S. Ct. 856, 870 (2007). Many of the members of the Supreme Court have recognized in

---

[2]It is significant that in the recent cases, *Rita v. United States*, 127 S. Ct. 2456 (2007), *Gall v. United States*, 2007 U.S. LEXIS 13083 (Dec. 10, 2007), and *Kimbrough v. United States*, 2007 U.S. LEXIS 13082 (Dec. 10, 2007), in which the Supreme Court upheld the district court sentences, *the sentence was within or below the guideline range corresponding to the jury verdict or guilty plea*. There was no ratcheting up of the sentence by enhancements outside of the initial sentencing range. There were no judicial fact findings that raised the sentence, and there is no Supreme Court case that allows a court to use guideline enhancements to raise a sentence above the guideline range corresponding to the jury verdict or plea. So when the Supreme Court uses the phrase "within the guidelines," as it does frequently in these cases, it is not yet clear what precisely it means or that it means enhanced sentences based on findings of facts by the judge over and above the facts found by the jury verdict or the guilty plea.

The Supreme Court did not say in *Gall* or *Rita* that the sentencing judge should "start" the sentencing process by enhancing the sentence aggravator by aggravator, as happened in the instant case. The Court said that the sentencing judge should begin with the "applicable Guidelines range" which in *Gall* was the initial base offense level corresponding to facts admitted by the guilty plea, which carried a range of 30 to 37 months. There is no language in *Gall* or *Rita* that requires appellate or district judges to "begin" with the enhancement process. That process is directly contrary to the language quoted below in *Blakely* that a "judge exceeds his proper authority" by basing a higher sentence on judicial findings outside the jury verdict.

[3]The empirical data on this point are clear. From 1990-2003, 90.6% of offenders received sentences adhering to the Guidelines range. In 2006, after *Booker* purportedly made the Guidelines "advisory," 86.3% of offenders still received sentences in the Guidelines range, a range including judicial enhancements. Furthermore, appellate review of these within-Guidelines sentences has not changed post-*Booker*, as circuit courts have affirmed 99.9% of within-Guidelines sentences. Conversely, Circuit courts reversed below Guidelines sentences almost 85% of the time, while only reversing above-Guidelines sentences in less than 5% of the cases. *See* James Bilsborrow, Note, *Sentencing Acquitted Conduct to the Post-Booker Dustbin*, 49 WM. & MARY L. REV. 289, 314-15 (2007).

opinions at one time or another the unprincipled, inconsistent  nature of the sentencing game in which we are now engaged.[4]

The only way to begin to return the process to something consistent with the Sixth Amendment and with the concept of individualized sentencing is to recognize and insist that we stick with two overriding principles: *First*, that judicial fact finding and the length of a sentence be limited somewhere within the base-offense-level, guideline range corresponding to the jury verdict or the plea, unless the sentencing judge explains why the concepts of general and individual deterrence should require a longer sentence for the particular individual and outweigh the mitigating circumstances of the case (including factors like age, addiction, and family responsibility deemed irrelevant by the Sentencing Commission in Chapters 5H and 5K), as well as the likelihood of successful rehabilitation. *Second*, that the sentencing judge explain the weighing process outlined above (taking into account moral culpability, general and special deterrence, mitigating circumstances and rehabilitation) so that the sentence and its explanation comply with the "overarching provision instructing district courts to 'impose a sentence . . . not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 2007 U.S. LEXIS 13082, at *30 (Dec. 10, 2007) (quoting 18 U.S.C. § 3553(a)). This "overarching provision," enacted by Congress in § 3553(a), sets a humane, balancing standard that the sentencing judge should keep as the Golden Mean governing the judicial reflection necessary in each sentencing case to reconcile contrary factors and arguments in the weighing process in order to arrive at a fair sentence.

In other words, the sentencing judge should start with the base offense level corresponding to the facts found by the jury verdict or admitted by the guilty plea. The sentencing judge should not go up or down from that point unless in his or her own mind the weighing process of the two overriding principles stated above requires it. The judge should not engage in guidelineism, adjusting the sentence up or down just because the guidelines say so, as occurred in the instant case, but rather because the judge's own sense of justice, upon reflection, leads to a different result than the beginning, base-offense level. This allows the guidelines to play a pivotal role to begin with but requires the judge to use his or her own mental faculties and best judgment, just as judges did in the days of indeterminate sentencing before the mandatory federal sentencing guideline era.

The job of the Court of Appeals should be only to see that the federal sentencing judge (1) starts at the right place in the reasoning process (at the base offense level corresponding to the jury verdict or guilty plea), as required by the Sixth Amendment as interpreted by *Blakely* and *Booker*, and (2) engages in a general process of serious dialectical reflection and reconciliation, as evidenced by the reasons given for deviating from the starting point established under Sixth Amendment constraints. This process should put an end to the rote, ratcheting-up process that now characterizes the sentencing process, a process based on the Commission's rule that mitigating factors are "not relevant."

This modified system based on these two principles is, more or less, what the system would have looked like in the beginning if the Guidelines were truly "guidelines" rather than mandatory rules. If the Commission, in the beginning, as many judges and lawyers recommended, had adopted guidelines to assist judges rather than to discipline and correct judges this modified system would have perhaps provided a workable system. I myself testified before the Commission advising it not to saddle the judiciary with mandatory rules that are constitutionally suspect because such rules would most likely eliminate individualized sentencing and full consideration of mitigating factors.

---

[4]See, for example, the separate opinions of Justice Stevens ("I am not blind to the fact" that "many federal judges continue to treat the Guidelines as virtually mandatory"); Justices Scalia and Thomas, ("no one knows — and perhaps no one is meant to know — how advisory Guidelines . . . will function in practice"); Justice Souter ("consistency began to falter," the "gravitational pull to now-discretionary Guidelines . . . preserve the very feature . . . that threaten to trivialize the jury right" so that it is "fair to ask just what has been accomplished"). *See Rita*, 127 S. Ct. 2456, 2474, 2475, 2487-88.

The Commission, however, believed that federal judges could not be trusted to exercise discretion properly and that harsher sentencing rules must be imposed on judges in order to insure longer sentences and collective uniformity. The current Guidelines that ratchet up sentences without considering mitigating factors or rehabilitation are the result.

The modified system described above is a different process of sentencing from either pure indeterminate sentencing, as it operated before the guidelines, or the mandatory, rote guideline process that prevailed before the Sixth Amendment was recognized as a limitation on fact finding. Hopefully, such a modified system would begin to provide a balance between the collectivized, sentencing process of lock-step, upward adjustments heretofore required by the Commission, and the thoughtful individual sentencing by federal judges that was the ideal behind the federal sentencing system used so effectively (in my opinion) for 200 years since the first Congress enacted the first sentencing law, 1 Stat. 112, ch. 9 (1790).[5] Further, a system that incorporates facets of indeterminate sentencing preserves the historical role of judges as sentencing experts and the jury as fact finder. Sentencing procedures based on these roles were never challenged as undermining the Sixth Amendment's right to a jury trial because judges did not function as objective fact finders and judge-found facts did not carry determinate consequences.

Such a modified system includes an element of democratic, legislative control over sentencing while keeping elements of individualized sentencing from the old system. Such a modified system may be strongly resisted by prosecutors and the Department of Justice officials who have now become accustomed to controlling sentencing through the charging process, the release of enhancement information to probation officers and plea bargaining. Back in my day as U.S. Attorney 40 years ago, prosecutors were viewed solely as parties to the case and not entitled to control the length of the sentence. Removing control of sentencing from the prosecutorial arm of the government should be viewed as a step forward, although it is really a step back in history to restore the benefits of individualized sentencing practiced by English and American judges since the beginning of the 18th Century.

The modified scheme proposed above squares with the most recent Supreme Court decision, *Gall v. United States*, No. 06-7949, 2007 U.S. LEXIS 13083, at \*21 (December 10, 2007), in which the Court instructed district court judges to "make an individualized assessment based on the facts presented" with the Guidelines operating as the "initial benchmark" but "not the only consideration." In *Gall*, the Supreme Court affirmed the district court's sentence of thirty-six months probation, a punishment based upon the district judge's individualized evaluation of the factors under 18 U.S.C. § 3553(a) — particularly rehabilitation — and rejected the appellate court's rote application of the Guidelines. Moreover, this approach lessens the likelihood of as-applied Sixth Amendment challenges, which, as Justice Scalia points out, are still available. *Id.* at \*39 (Scalia, J., concurring).

Unfortunately, the sentencing process in this case was just a repeat of guidelinitis, the system of rote sentencing in which the sentencing judge ratchets up the sentence instead of engaging in anything close to the deliberative or reflective process outlined by the two overriding principles stated above. The district court just did the same thing after *Booker* that it did before *Booker* — no change, no new thoughts. Then our court did the same thing it did before *Booker* — no change, no new thoughts. I would reverse and remand the case for resentencing in compliance with the two

---

[5]The system of jury fact finding and individualized sentencing by judges enacted by the First Congress was the system developed to reconcile justice with mercy by our judicial forebearers as the English system of criminal law — developed particularly after the demise of the prerogative courts of Star Chamber and High Commission following the English civil war, the Glorious revolution of 1688, the English Bill of Rights of 1689, and the creation of an independent judiciary in the Judges' Bills of 1692 and 1701. *See* Harold J. Berman, *Law and Revolution II, The Impact of the Protestant Reformation on the Western Legal Tradition*, 226-28, 306-29 (Harvard Univ. Press 2003); Blackstone, *Commentaries on the Laws of England, Book IV*, Chap. 29, 368-82 (Legal Classics Library Ed. 1983). The Sentencing Guidelines removed individualized sentencing by judges that had existed in Anglo-American law for more than three centuries.

overriding principles stated above.  The sentencing court should start in each man's case with the guideline sentence corresponding to the jury verdict, take a look at how the guidelines would operate from that point and then engage in the weighing and explanatory process outlined above without feeling an obligation to reach a result consistent with the Commission's guideline structure or policies.  After finding the beginning guideline sentence, it is up to the judge to act like a common law judge of old engaged in the same process that prevailed in the federal system after 1790 but before the failed, 20-year experiment in mandatory guideline sentencing.