NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0367n.06

Case No. 11-6431

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Apr 12, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| JOHN C. ELLIOTT, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: BATCHELDER, Chief Judge; DAUGHTREY and ROGERS, Circuit Judges.

ALICE M. BATCHELDER, Chief Judge. Appellant John Elliott was charged in eight counts of a multi-count, multi-defendant indictment for wire fraud. He pled guilty to one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343, and was sentenced to 200 months in prison. On appeal, he challenges the procedural and substantive reasonableness of his sentence. We affirm the judgment of the district court.

I.

Appellant John Elliott and several coconspirators discovered a way to pass bad personal checks as traveler's checks at Target, Walmart, Meijer, and Kohl's stores. From February 2008 through December 2010, the group hit stores in fifteen different states and stole $218,816.68.

To effect the fraud, one of the conspirators would obtain bad personal checks, usually in his own name or the name of another conspirator, although in one instance stolen checks were used. The individual would then go to a retail store, usually Target (Target thefts accounted for $170,000

of the losses), and fill a cart with just under $400 worth of merchandise. Next he would look for an inexperienced cashier and trick that cashier into processing the personal check as a traveler's check. So long as the check was for under $400, it would clear the system as a traveler's check without any security processing, resulting in a receipt indicating a cash transaction. The conspirator could then either keep the goods or return them at another store for cash. The goal was to obtain enough funds for the group's members to support their individual drug habits.

The scheme was extraordinarily successful. The total figure presented by the government from the stores' loss reports suggests that the group must have successfully used the scheme close to 550 times over a couple of years. But it did not always work, and one botched attempt is particularly relevant to this appeal. In March 2010, Elliott took a new coconspirator, Brian Hancock, with him to Target to pass checks. Elliott had checks in the name of another member of the group, Troy Watts, but Hancock, attempting to use the checks and identity card of one David Owens, was detained in the store. Seeing this, Elliott fled. Before being apprehended and detained by police, Elliott managed to contact Watts and convince him to tell the police that he had given Elliott permission to use the checks. Watts did so and Elliott was released. Hancock, on the other hand, was arrested under his assumed identity–as it turned out, the real David Owens had an outstanding arrest warrant. Elliott, of course, knew Hancock was not Owens but did not provide this information to the police.

Eventually the group ran out of luck. In November 2010, Target reported the scheme to the Secret Service, and by the end of the month, the Secret Service had identified several of the coconspirators. Elliott came in contact with the agent in charge of the case during an investigatory

sting near the end of November. On December 6, he agreed to meet with the agent but did not appear at that time for an interview, nor was the agent able to conduct any successful interview until February 11, 2011. Elliott signed a written confession at that time, and in June pled guilty to one count of conspiracy to commit wire fraud. Also in June, Elliott tried to meet with the agent to provide additional information, but the agent refused, later noting at sentencing that by that point he "didn't need any information from Mr. Elliott."

At sentencing, the district court determined that the base level for the offense was 7. The court then added 12 levels for the amount of the loss resulting from the wire fraud scheme, 2 levels for the number of victims, 2 levels because Elliott had relocated to a different jurisdiction to avoid law enforcement, 4 levels for Elliott's managerial role in the scheme, and 2 levels for obstruction of justice because Elliott had actively deceived the police with regard to the scheme. The court denied Elliott's request for a 3-level reduction for acceptance of responsibility, and arrived at an adjusted offense level of 29. Finally, the court concluded that Elliott's criminal history category as calculated by the Probation Officer substantially underrepresented the seriousness of his criminal history, and departed upward one offense level, for a final offense level of 30. The court imposed a sentence of 200 months' incarceration. Elliott's appeal challenges only the substantive and procedural reasonableness of his sentence.

## II.

We review the reasonableness of sentencing decisions using an abuse of discretion standard. *United States v. O'Georgia*, 569 F.3d 281, 287 (6th Cir. 2009). Reasonableness has "both substantive and procedural components." *Id*. Elliott brings six claims, challenging: (1) the

procedural reasonableness of the one-level upward departure based on the inadequacy of Elliott's criminal history score, (2) the procedural reasonableness of the two-point enhancement for obstruction of justice, (3) the procedural reasonableness of the court's refusal to grant a downward departure for Elliott's medical condition and substance abuse, (4) the procedural reasonableness of the district court's acceptance of responsibility analysis, (5) the substantive reasonableness of the district court's § 3553(a) analysis of Elliott's history and characteristics, and (6) the substantive reasonableness of the sentence taken as a whole. We consider each of these claims in turn.

We will find a decision procedurally reasonable if "the district court committed no significant procedural error, such as . . . failing to adequately explain the chosen sentence–including an explanation of any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). In addition, a district court must have "explain[ed] 'its reasoning to a sufficient degree to allow for meaningful appellate review.'" *United States v. Vowell*, 516 F.3d 503, 510 (6th Cir. 2008) (quoting *United States v. Trejo-Martinez*, 481 F.3d 409, 412-13 (6th Cir. 2007)). If counsel fails to raise an objection at the sentencing hearing after being asked whether he has any objections that have not previously been raised in the proceeding, the claim is reviewed only for plain error. *See United States v. Bostic*, 371 F.3d 865, 870-71 (6th Cir. 2004); *United States v. Vonner*, 516 F.3d 382, 391-92 (6th Cir. 2008) (noting that plain-error review applies on appeal to arguments that defendant "never presented to the district court, even after being invited to do so through the *Bostic* question").

**III.**

Elliott first argues that, in departing upward based on the inadequacy of Elliott's criminal history score, the district court did not properly apply U.S.S.G. § 4A1.3. The upward departure was

made *sua sponte* by the district court, and Elliott's counsel declined to object to it when prompted at the end of the sentencing hearing. Indeed, in response to the district court's question, Elliott's counsel said, "Your Honor, as far as *Bostic*, I would ask the Court to make a finding that the entry of the plea was timely under the policies of this Court. . . . [A]s far as the sentence itself, I have no requests." Because counsel did not object, under *Bostic*, we review Elliott's challenge to the upward departure, to the extent that it is based on insufficiency of district court findings, only for plain error. *See Vonner*, 516 F.3d at 391.

An upward departure may be warranted where "the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1); *United States v. Thomas*, 24 F.3d 829, 833 (6th Cir. 1994). The Sentencing Guidelines application notes explain that "the nature of the prior offenses rather than simply their number is often more indicative of the seriousness of the defendant's criminal record." U.S.S.G § 4A1.3, App. Note 2(B).

Elliott argues that the district court did not make sufficient findings to explain the upward departure under this rule because the court's explanation focused only on the number of prior offenses. The Presentence Investigation Report found that Elliott had a criminal history score of 17, four points higher than the threshold for criminal history category VI. The court expressly noted that it "looked at the nature of the offenses that have been committed" and not "merely to the number of past criminal convictions." The court also stated that the varied "nature of the convictions" is indicative of someone who "commits every type of offense that he can commit at a particular time."

But the district court also reasonably focused on the *number* of prior offenses and the

likelihood of recidivism. At the age of 28, Elliott had forty-seven adult convictions, twenty-four juvenile offenses, and thirty additional arrests. That averages to over four convictions a year since he was 18, better than seven arrests a year, and close to four convictions a year since he was 10. After noting these numbers, the district court concluded that there was more than a 99% chance of recidivism, and thus an upward adjustment was appropriate. This is a correct application of the law. *Thomas*, 24 F.3d at 833 ("An unusually high likelihood of recidivism is also a valid factor upon which to base an upward departure." (citing U.S.S.G. § 4A1.3, cmt. (backg'd))). Even the *Morgan* decision, on which Elliott heavily depends for his argument, acknowledges that an upward departure may be warranted for either the seriousness of defendant's criminal conduct or for a high rate of recidivism. *United States v. Morgan,* 54 F. App'x 421, 424 (6th Cir. 2002).

Elliott also argues that the upward departure is procedurally unreasonable because there is insufficient evidence to justify the upward departure. In support of this argument, Elliott notes that most of his prior convictions were for driving infractions and disorderly conduct (accounting for 34 of his 47 convictions), most were non-violent (he has one conviction for choking a victim), and only one was a felony. The somewhat benign nature of these previous offenses is reflected in Elliott's criminal history score of 17, which is only 4 points higher than the threshold level for Category VI despite the very high number of convictions.

It is true that Elliott does not have a record of violent crime, but that is beside the point. The district court made its decision based on the extensiveness of his record and the likelihood of recidivism. Elliott maintains that an upward departure is appropriate only when the criminal history score is "a multiple of the Category VI threshold of 13," but this is simply not true. *See, e.g.*, *United*

*States v. Sanders*, No. 11-5772, 2012 WL 4477528, *3 (6th Cir. Sept. 28, 2012) (finding a three-level upward departure was reasonable when the defendant had a criminal history score of 25); *United States v. Christoph*, 904 F.2d 1036, 1042 (6th Cir. 1990) (noting that an upward departure was reasonable when the defendant had a criminal history score of 17), *superseded by statute on other grounds, see United States v. Williams,* 940 F.2d 176, 181 n.3 (1991).

The district court's decision to depart upward by one level was not erroneous.

**IV.**

Elliott next challenges the two-level increase he received for obstruction of justice. The obstruction-of-justice increase is based on Elliott's actions in March of 2010, when he successfully convinced the police to release him from custody after Hancock was detained. It was not until nine months after Elliott evaded police detection that the broader scheme was uncovered. The district court found that Elliott's statements to police were purposeful and materially false, and that they significantly impeded the investigation into his offense. Elliott makes two arguments here: (a) that the court failed to explain its reasoning and did not address his objection, and (b) that there was insufficient evidence to support the decision. Our review of the district court's decision is not limited to plain error because Elliott contested the obstruction of justice increase at sentencing.

A two-level increase for obstruction of justice is appropriate if two factors are met. First, the defendant must have "willfully obstructed or impeded, or attempted to willfully obstruct or impede, the administration of justice[.]" U.S.S.G. § 3C1.1. This includes obstructive conduct prior to the start of the investigation if it is "purposefully calculated, and likely, to thwart the investigation." *Id*. at n.1. Further, if the obstructive conduct is simply a "false statement, not under oath, to law

7

enforcement officers" (as it is here), the standard is a bit higher. *Id*. at n.5(B). To constitute obstructive conduct, a false statement must be "materially false" and must have "significantly obstructed or impeded" the investigation or prosecution. *Id*. at n.4(a). Second, the obstructive conduct must be *related to* the "offense of conviction and any relevant conduct." *Id*. at § 3C1.1.

That the defendant's conduct was "purposefully calculated" to "thwart the investigation" is clear from the factual context. Elliott blatantly deceived the police by lying to them and convincing Watts to back up his story. That statement was "materially false." That this "significantly impeded" the investigation is likewise clear since the police believed Elliott's story, let him go, and the conspiracy was not uncovered until several months later.

Elliott's primary objection at trial and on appeal is that the obstruction was not related to the "instant offense." Elliott's brief suggests that the obstruction must have been related to the Secret Service investigation into the particular federal crime with which Elliott was charged. He points to some confusion in the record about whether–but for Elliott's deception–the police would have contacted the Secret Service (which handled the federal investigation) in March when Elliott was detained briefly and released. But the district court rightly notes that this is "not dispositive." It does not matter whether the police would have contacted the Secret Service because the statute requires only that the obstructive conduct relate to the "instant offense." *See United States v. Walker*, 119 F.3d 403, 407 (6th Cir. 1997) ("[T]his circuit has given a broad reading to the 'instant offense' language."); *United States v. Nesbitt*, 90 F.3d 164, 169 (6th Cir. 1996) ("[T]his conduct was related to the 'instant offense' in that it was intended to impede the same government investigation that eventually resulted in [defendant's] plea bargain and conviction."); *United States v. Crousore*, 1 F.3d

382, 385 (6th Cir. 1993) ("Therefore, the test is not whether the false statement was about the actual crime charged, but whether it was made during the investigation, prosecution, or sentencing of the 'instant offense.'"). The "instant offense" here is the wire fraud scheme, in its entirety.

The district court correctly noted that Elliott "prevented the Springdale Police Department from learning the true nature of the criminal activity" and "had the intent to prevent law enforcement authorities from discovering the scope and the nature of the conspiracy." This had a significant impact–he was successful enough in impeding the police through his false statements that he and his coconspirators were able to continue to operate for nine more months. The false statement Elliott made to police in March of 2010 was related to, and obstructed, the investigation into the instant offense of passing bad checks as travelers' checks.

The court adequately explained its reasoning here and there is sufficient evidence to support its conclusion. The district court's ruling was procedurally reasonable.

**V.**

Elliott's next claim is that the district court's decision was procedurally unreasonable because it failed to consider Elliott's medical condition and substance abuse as possible reasons for a downward departure. This claim has no basis in the record. And because, as the government's brief correctly notes, Elliott never requested a downward departure based on his medical conditions and substance abuse, we review for plain error. Elliott's counsel *did* mention both as reasons for giving a sentence on the lower end of the advisory range. And the court *did* address these arguments; it simply did not find them credible. The district court noted that the sentence must account for Elliott's need for medical care, corrective treatment, and treatment for drug abuse. But the court also

noted that "not all of his criminal history can be attributed to drug use" and that Elliott seemed to exhibit a disregard for the illegality of his conduct. Both rehabilitation and punishment were necessary. In pursuit of the former, the district judge made sure that Elliott was enrolled in an intensive drug treatment program, and that he would receive both a medical assessment and a mental health assessment.

We find no plain error here.

## VI.

Elliott next argues that the district court committed procedural error by misapplying the acceptance-of-responsibility guidelines. Elliott requested a three-level reduction for acceptance of responsibility, but U.S.S.G. § 3E1.1(b) does not permit a three-level reduction without the acquiescence of the government, which did not support the reduction here. Although the PSR recommended a reduction, the court refused to grant one because Elliott had not "truly admitted his activities or the scope of the conspiracy" and had denied his role in "[t]he actions that were taken by other individuals" in the case.

We review for clear error the district court's decision to deny this reduction. *United States v. Smagola*, 390 F. App'x 438, 444 (6th Cir. 2010); U.S.S.G. § 3E1.1, cmt. n. 5. The burden is on the defendant to "clearly demonstrat[e]," by a preponderance of the evidence, "acceptance of responsibility for his offense." *Id*. at § 3E1.1(a). This includes "truthfully admitting the conduct comprising the offense" and "truthfully admitting or not falsely denying any additional relevant conduct." *Id*. at cmt. n. 1(A). In addition, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with

acceptance of responsibility." *Id.*

The district court's denial is grounded in the defendant's denial of the scope of his participation in the conspiracy, and other relevant conduct. Throughout the sentencing hearing, Elliott contested the government's assertion that he was the ringleader of the conspiracy, and contested the total amount stolen (admitting only to the amount of loss resulting from his own bounced checks). Elliott continued to contest both claims in the face of overwhelming evidence. For instance, defense counsel admitted that several other defendants had "acknowledged in their plea agreements that they were recruited or taught in some fashion how to do these things by Mr. Elliott," and that defense counsel had "no evidence to offer contra to that" but insisted on objecting anyway. Similarly, although "all of the other defendants have conceded the amount of loss to be the $218,816.68 figure," Elliott's defense counsel continued to object to it "solely for purposes of appeal." Both his leadership role and the amount stolen are relevant to the offense. The court emphasized that because of these objections, the government was forced to "present a substantial amount of testimony" to show that Elliott "was, in fact, responsible for all aspects of the conspiracy" in order to prove his leadership role and to show that he was responsible for the complete sum.

Elliott's rebuttal is inadequate. First, it is true that Elliott took the initiative by contacting the federal agent, signing a written confession, and later pleading guilty. But none of this rebuts the reasoning of the district court, which found Elliott's level of cooperation inadequate. Second, Elliott claims that the district court's ruling means that he must "accept the government's every proposed adjustment, no matter how unsupported." This is simply another way of claiming that his contentions were not "frivolous" under the statutory definition. Here, his role in the scheme and the

amount of loss resulting from the conspiracy he led both constitute relevant conduct that Elliott had no factual basis for contesting. Finally, Elliott's brief argues that his objections were not "a denial of relevant *conduct*" but merely a "denial of the *legal characterization* of that conduct." This was simply not the argument made by Elliott's counsel at the sentencing hearing.

The district court did not clearly err in finding that Elliott did not merit a reduction for acceptance of responsibility.

**VII.**

Fifth, Elliott argues that his sentence is substantively unreasonable because the district court ignored his history and characteristics, a relevant 3553(a) factor. 18 U.S.C. 3553(a). Specifically, Elliott alleges that the district court ignored his bipolar disorder, his struggles with schizophrenia, and his substance abuse.

A sentence will be substantively unreasonable if "the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir.2008) (citation and quotation marks omitted). We review a challenge to the substantive reasonableness of a district court's sentencing determination under the abuse-of-discretion standard. *United States v. O'Georgia*, 569 F.3d at 287.

As we have already explained, the court *did* consider both Elliott's mental health and drug abuse in its sentencing decision. And the court expressly considered Elliott's history and characteristics. The court found that while some of Elliott's past offenses could be attributed to his drug dependency and medical condition, others could not. The court gave a higher sentence because

12

of punitive and recidivist concerns. But the court also recommended that Elliott participate in an intensive drug treatment program, that he receive a medical and mental health assessment, and that he be closely monitored for drug use during his supervised release. In other words, it weighed Elliott's history of repeated criminal offenses against his history of mental health disorders and drug abuse and addressed both in pronouncing sentence. Like the defendant in *United States v. Ely*, Elliott "does not identify any argument that he raised and the district court failed to address, but instead asks us to balance the factors *dif[f]erently* than the district court did. This is simply beyond the scope of our appellate review. . . ." *Ely,* 468 F.3d 399, 404 (6th Cir. 2006) (emphasis in original). This claim of error is meritless.

## VIII.

Elliott's final argument is a catch-all cumulative substantive-reasonableness claim. In essence, Elliott contends that his sentencing included many "close calls"–such as the criminal history upward departure, the obstruction of justice enhancement, denial of acceptance of responsibility, and Elliott's substance abuse–that, taken together as the "totality of the circumstances," resulted in a substantively unreasonable sentence.

The mere fact that a series of sentencing decisions–none of which is itself erroneous– results in a harsher sentence does not make the sentence unreasonable. Elliott offers no additional arguments here to persuade us that these decisions, taken together, result in an unreasonable sentence. We find no abuse of discretion here.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.