NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0141n.06

Case Nos. 24-1427/1441/1446

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Mar 12, 2025<br>KELLY L. STEPHENS, Clerk |
| Plaintiff - Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| DARNELL DAISHAN MOORE (24-1427); | ) | COURT FOR THE WESTERN |
| TERRANCE JAMAL MOORE (24-1441); ELLIS | ) | DISTRICT OF MICHIGAN |
| LEKIETH HULL (24-1446), | ) | |
| | ) | OPINION |
| Defendants - Appellants. | ) | |
| | ) | |

BEFORE: SUTTON, Chief Judge; MOORE and RITZ, Circuit Judges.

**RITZ, Circuit Judge.**

These consolidated appeals arise out of a drug-trafficking conspiracy that took place in early 2023 in and around Kalamazoo, Michigan. The three defendants each pled guilty to conspiracy to distribute and possess with intent to distribute fentanyl, hydrocodone, and methamphetamine. On appeal, they contest various aspects of their respective sentences. We affirm.

## I. Background

### A. The Investigation, Search, and Arrests

In January 2023, a confidential informant told an investigator with the Kalamazoo Valley Enforcement Team ("KVET"), a team of multi-jurisdictional narcotics officers, that Terrance Moore and Ellis Hull were coordinating sales of fentanyl and heroin through a shared "dope phone." Hull and Terrance Moore had previously been investigated for a similar scheme, and law

enforcement began a new investigation based upon what the confidential informant told them. In the same month, a confidential source bought 0.48 grams of fentanyl from Terrance Moore.

Meanwhile, officers began surveillance of Terrance Moore's rented residence, a house on Hazard Avenue in Kalamazoo, and, in February 2023, pulled trash from garbage bins outside of the house. In the trash were twenty-five plastic bags with the corners torn off, an empty box of sandwich bags, a large food saver bag containing methamphetamine residue, a sandwich baggie with a powdery substance, and a receipt for "Ellis" with a phone number on it. Based on this evidence, KVET investigators got a warrant to search the Hazard house as well as a Nissan Altima that Terrance Moore was renting.

Officers executed the search warrant on March 2, 2023. When they entered the Hazard house, they encountered Darnell Moore,[1] Terrance's cousin, who ran to the bathroom with a baggie of a light-colored substance. Officers found Hull in the living room and Terrance in the master bedroom, along with Terrance's two-year-old daughter and the child's mother.

Officers recovered several items associated with drug trafficking during the search, including the following drugs: (1) 2.65 grams of fentanyl and 5.53 grams of pure methamphetamine in individually knotted baggies in Terrance's pocket; (2) 311.7 grams of pure methamphetamine in a Pacman mini-arcade game; (3) 25.1 grams of pure methamphetamine in what investigators described as a "mini-bedroom"; (4) 4.41 grams of fentanyl in bags in a pill jar; and (5) 1.2 grams of buprenorphine, 5.89 grams of clonazepam, and 89.62 grams of hydrocodone in the master bedroom. Officers also found two handguns: one on the passenger seat of the Altima and one in the master bedroom where officers found Terrance. And they found $4,825 in the master bedroom.

---

[1] For ease of reference, we will refer to Terrance Moore and Darnell Moore by their first names.

Officers interviewed the four adults present. Terrance's child's mother told officers that Terrance rented both the Altima and the Hazard house. She said that Terrance was the only occupant of the home, but that Hull and Darnell Moore would sometimes spend the night. Darnell admitted that he came into the house at 3:00 that morning to sleep, but claimed that he slept in the living room, and not in the mini-bedroom where officers found his documents and phone. Hull told law enforcement officers that he had been homeless ever since being evicted from his prior apartment. And Terrance admitted that he rented and lived at the Hazard house and that Darnell and Hull would come and go, sometimes sleeping there.

A six-count federal indictment was filed against the three men in July 2023. When officers arrested Terrance later that month, they found 1.19 grams of fentanyl and $1,121 in his pocket.

## B. Plea Agreements

Each defendant pled guilty to a single count of conspiracy to distribute and possess with intent to distribute controlled substances (fentanyl, hydrocodone, and methamphetamine), in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C). Terrance's plea agreement specified that the amount of pure methamphetamine involved in the offense was 50 grams or more, in violation of 21 U.S.C. § 841(b)(1)(A)(viii). His plea agreement also contained an admission that the $4,825 in cash seized during the search constituted proceeds derived from the conspiracy offense.

In their plea agreements, all three defendants admitted they would "routinely store their controlled substances" at the Hazard house. RE 73, D. Moore Plea Agr., at PageID 288; RE 74, Hull Plea Agr., at PageID 297; RE 75, T. Moore Plea Agr., at PageID 308. Although none of the plea agreements contained any stipulation as to the total quantity or type of drugs that were within the scope of the conspiracy, each defendant admitted to possession of various drugs seized during

3

the search. For instance, Terrance admitted that he jointly possessed with intent to distribute all of the drugs found in his pockets and in the residence, except for those drugs found in the mini-bedroom. Darnell admitted to jointly possessing with intent to distribute the drugs seized from the residence, but not to any drugs found in Terrance's pockets or derived from the $4,825 that was seized. And Hull admitted to jointly possessing with intent to distribute the methamphetamine found in the mini-Pacman arcade game and the hydrocodone, but not to the other drugs or quantities derived from the cash. All three defendants admitted that the conspiracy lasted from January 2023 through March 2, 2023.

## C. Presentence Reports

### 1. Terrance Moore

In preparation for sentencing, the Probation Office prepared presentence investigation reports ("PSRs") calculating each defendant's advisory sentencing range under the Sentencing Guidelines.

The calculation in Terrance's PSR began with U.S.S.G. §2D1.1, the provision applicable to possession-with-intent-to-distribute offenses. The PSR held Terrance responsible for at least 10,000 kilograms, but less than 30,000 kilograms, of converted drug weight. In calculating this amount, the PSR converted all of the cash seized ($4,825 from the search of the Hazard house and $1,121 from Terrance's person upon arrest) to actual methamphetamine. The cash was converted to 23.78 ounces of actual methamphetamine based a price of $250 per ounce, which stemmed from the probation officer's determination that "pure" methamphetamine was selling for between $175 and $250 per ounce at the time. That calculation resulted in a converted drug weight for the cash-to-actual-methamphetamine of 13,483.20 kilograms. The total converted drug weight of all drugs and cash seized was 20,953.64 kilograms, as shown in the chart below.

| Controlled Substance | Quantity | Converted Drug Weight |
|---|---|---|
| Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] Propanamide) | 8.336 gm | 20.84 kg |
| Methamphetamine (actual) | 342.33 gm | 6,846.60 kg |
| Currency converted to Methamphetamine (actual) | 23.78 oz | 13,483.20kg |
| Schedule III substances (except Ketamine) | 1.2 units | 1.2 gm |
| Oxycodone (actual) | 0.38 gm | 2.55 kg |
| Hydrocodone (actual) | 89.62 gm | 600.45 kg |
| Schedule IV substances (except Flunitrazepam) | 5.89 units | 0.36 gm |
| Total | | 20,953.64 kg |

Based on this amount and U.S.S.G. §2D1.1(c)(3), the probation officer calculated Terrance's base offense level as 34.

The PSR also recommended a two-level enhancement under §2D1.1(b)(1) because Terrance possessed two firearms; another two-level enhancement under §2D1.1(b)(12) for maintaining a residence for the purpose of selling and storing controlled substances (a stash house); and a third two-level enhancement under §3B1.1(c) for his leadership role in the conspiracy. After deduction of three points for acceptance of responsibility, Terrance's final recommended offense level was 37. With a criminal history category of III, Terrance's resulting advisory guidelines range was 262 to 327 months.

Terrance filed written objections to the PSR, objecting to the scoring of cash converted to drug weight and to the leadership enhancement.

2.    Darnell Moore

Darnell's PSR recommended a base offense level of 34, based on his responsibility for 18,409.26 kilograms of converted drug weight, as set out here:

| Controlled Substance | Quantity | Converted Drug Weight |
|---|---|---|
| Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] Propanamide) | 6.666 gm | 16.66 kg |
| Methamphetamine (actual) | 342.33 gm | 6,846.59 kg |
| Schedule III substances (except Ketamine) | 1.2 units | 1.2 gm |
| Schedule IV substances (except Flunitrazepam) | 5.89 units | 0.36 gm |
| Hydrocodone (actual) | 89.62 gm | 600.45 kg |
| Oxycodone (actual) | 0.38 gm | 2.54 kg |
| Currency converted to Methamphetamine (actual) | 19.3 oz | 10,943.00kg |
| Total | | 18,409.26 kg |

Darnell's PSR converted only the $4,825 seized from the search of the Hazard house (and not the $1,121 seized from Terrance) to actual methamphetamine.

The PSR also recommended a two-level enhancement based on Terrance's possession of two firearms, which the probation officer believed was "reasonably foreseeable" to Darnell. After subtracting three points for acceptance of responsibility, Darnell's final recommended offense level was 33. Based on Darnell's criminal history category of VI and the statutorily authorized maximum sentence, his guidelines range was 235-240 months.

Darnell filed written objections to the PSR, objecting to the conversion of the cash to actual methamphetamine and to the firearm enhancement. In a later filing, the probation officer stated

that the firearm enhancement would be appropriate because Darnell possessed his own firearm during the conspiracy.

### 3.    Ellis Hull

Finally, Ellis Hull's PSR recommended a base offense level of 34, a two-level enhancement based on Terrance's firearms, and a three-level reduction for acceptance of responsibility, resulting in a final recommended offense level of 33.  Hull was in criminal history category of III.  His advisory sentencing guidelines range was 168-210 months, but the probation officer indicated that his diagnosis of schizophrenia could provide a potential basis for departure under the Sentencing Commission policy statements on mental and emotional conditions (U.S.S.G. §5H1.3) and diminished capacity (U.S.S.G. §5K2.13), or for a variance below the guidelines range.  The probation officer wrote that, although Hull's illness did not appear to have affected his ability to know that what he was doing was illegal, his schizophrenia affected his judgment and his susceptibility to being manipulated by others.

Hull filed a sentencing memorandum and a motion for a downward variance, arguing that the district court should vary downward from the guidelines and sentence him to fewer than 60 months of imprisonment, based on the recommendation in his PSR.

### 4.    Supplemental Addenda to PSRs

Prior to the sentencing hearings, the Probation Office filed supplemental addenda to the PSRs.  Whereas the initial PSRs converted all of the currency seized from both the home and from Terrance when he was arrested to pure methamphetamine, the addenda separated the currency that was seized during the search of the Hazard house from the currency seized from Terrance.

With respect to the $4,825 seized during the execution of the search warrant, the addenda noted that, during that search, law enforcement officers seized 7.06 grams of fentanyl and 342.33

grams of actual methamphetamine, for a combined weight of 349.39 grams of drugs seized. Of that total drug amount, 2.02% was fentanyl and 97.98% was pure methamphetamine. The probation officer thus revised the cash-to-drug conversion to use these proportions, converting 2.02% of the cash seized to fentanyl and 98.98% of the cash seized to pure methamphetamine. Using a cash conversion rate of $104 per gram of fentanyl and $250 per ounce of methamphetamine, the revised conversion of the $4,825 seized from the Hazard house resulted in $98 converted to fentanyl (0.94 grams), for a converted drug weight of 2.34 kilograms of fentanyl; and $4,727 to pure methamphetamine (18.90 ounces), for a converted drug weight of 10,716.00 kilograms of pure methamphetamine.

The total converted drug weight for Terrance was therefore 18,216.66 kilograms:

| Controlled Substance | Total Quantity | Converted Drug Weight |
|---|---|---|
| Fentanyl | 8.73 grams | 21.81 kg |
| Methamphetamine (actual) | 342.33 grams | 6,846.60 kg |
| Schedule III substances (except Ketamine) | 1.2 units | 0.0012 kg |
| Schedule IV substances (except Flunitrazepam) | 5.89 units | 0.00036 kg |
| Hydrocodone (actual) | 89.62 grams | 600.45 kg |
| Oxycodone (actual) | 0.38 gram | 2.54 kg |
| Currency converted to Fentanyl | 11.71 grams[2] | 29.26 kg |
| Currency converted to Methamphetamine (actual) | 535.80 grams | 10,716.00 kg |
| Total Converted Drug Weight | | 18,216.66 kg |

---

[2] The $1,121 seized from Terrance's person upon his arrest was converted entirely to fentanyl in his supplemental addendum, which is why the "Currency Converted to Fentanyl" line has a higher total quantity for Terrance than for Darnell. At a rate of $104 per gram of fentanyl, the $1,121 was the equivalent of 10.77 grams of fentanyl.

RE 119, Supp. Add. to T. Moore PSR, at PageID 657. Even after the re-conversion of the cash, Terrance's base offense level remained 34, and his guidelines range did not change.

The addendum to Darnell's PSR also reflected a proportionate conversion of the currency seized from the Hazard house to methamphetamine and fentanyl:

| Controlled Substance | Total Quantity | Converted Drug Weight |
|---|---|---|
| Fentanyl | 7.06 grams | 17.64 kg |
| Methamphetamine (actual) | 342.33 grams | 6,846.60 kg |
| Schedule III substances (except Ketamine) | 1.2 units | 0.0012 kg |
| Schedule IV substances (except Flunitrazepam) | 5.89 units | 0.00036 kg |
| Hydrocodone (actual) | 89.62 grams | 600.45 kg |
| Oxycodone (actual) | 0.38 gram | 2.54 kg |
| Currency converted to Fentanyl | 0.94 grams | 2.34 kg |
| Currency converted to Methamphetamine (actual) | 535.80 grams | 10,716.00 kg |
| Total Converted Drug Weight | | 18,185.57 kg |

RE 120, Supp. Add. to D. Moore PSR, at PageID 659-60. As with Terrance, Darnell's base offense level remained 34 after the cash was re-converted in the addendum.

### D. Sentencing Hearings

#### 1. Terrance Moore

Terrance raised two arguments at his sentencing hearing: (1) the $4,825 should not have been converted entirely into actual methamphetamine because he had been trafficking in fentanyl and heroin before the search of the Hazard house turned up methamphetamine; and (2) he should

not receive a two-point enhancement for his leadership role because he worked jointly with Hull. The district court overruled both objections.

As to the currency-to-drug conversion, the district court reasoned that, although Terrance had trafficked other drugs in the past, it would be "speculative" to score the drugs as he urged. RE 143, T. Moore Sent. Tr., at PageID 870. The court therefore converted the cash according to the ratio of the quantities and known purity of the types of drugs seized at the Hazard house. As to the leadership enhancement, the district court found that the Hazard house, which Terrance rented, was the "hub of . . . activity" for the conspiracy. RE 143, T. Moore Sent. Tr., at PageID 881. Additionally, text messages and other communications showed that Terrance was directing activity as to customer communications, delivery, and pricing of the drugs. *Id.* at PageID 881-82. After considering the sentencing factors in 18 U.S.C. § 3553(a), the district court sentenced Terrance to 262 months' imprisonment, the bottom of his advisory guidelines range.

### 2. Darnell Moore

Darnell argued at his sentencing that: (1) the conversion of cash to total drug quantity was incorrect because the conspirators sold methamphetamine mixture, not pure methamphetamine; and (2) he should not receive a two-point enhancement for Terrance's possession of the two handguns. The district court overruled both objections.

As to the purity of the drugs, the district court noted that all of the methamphetamine was tested and came back as pure, so the district court believed the currency conversion was correct. As to the handgun objection, the district court found, based on text messages that Darnell exchanged prior to the search of the Hazard house, that Darnell himself had actually or constructively possessed a handgun during the conspiracy. The court further noted that "I don't know that it's clearly improbable that the weapon was connected with the offense." *Id.* at PageID

801. The court further found that Terrance had openly possessed the two other handguns in the residence and that guns are tools of drug trafficking, so his possession of those weapons was foreseeable to Darnell. After considering the § 3553(a) factors, the district court sentenced Darnell to 235 months' imprisonment, the bottom of his advisory guidelines range.

### 3.    Ellis Hull

Finally, Hull sought a departure or variance from his guidelines range based on his diagnosed schizophrenia. The district court rejected this argument, first declining to grant a departure under §5H1.3 or §5K2.13 because it was not convinced that Hull suffered from schizophrenia to an "unusual degree" and because, based on the evidence presented, it was not convinced that Hull was operating with "significantly reduced mental capacity" at the time of the offense. The district court also found no specific evidence that Terrance took advantage of Hull due to his schizophrenia. The district court then considered the § 3553(a) factors but declined to vary from the guidelines range, finding that Hull was "fully engaged" with the conspiracy. Hull was sentenced to 168 months' imprisonment, the bottom of his advisory guidelines range.

Each defendant timely appealed his sentence.

### II.    Analysis

"[A]ppellate review of sentencing decisions is limited to determining whether they are 'reasonable,'" and this reasonableness is reviewed "under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 46, 51 (2007). "Sentences in criminal cases are reviewed for both procedural and substantive reasonableness." *United States v. Morgan*, 687 F.3d 688, 693 (6th Cir. 2012). The procedural component requires that we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors,

selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51. Under the abuse-of-discretion standard, "[t]he district court's legal interpretation[s] of the Guidelines are reviewed de novo, but its factual findings will not be set aside unless they are clearly erroneous." *United States v. Brooks*, 628 F.3d 791, 796 (6th Cir. 2011).

### A. Terrance Moore

Terrance raises three issues: (1) whether the district court erred in converting the cash seized during the execution of the search warrant to pure methamphetamine; (2) whether the district court erred in applying a leadership enhancement; and (3) whether his sentence was substantively reasonable.

#### 1. Conversion of Cash to Pure Methamphetamine

Terrance does not object to the $4,825 seized during the search of Hazard house being converted to drug weight for purposes of his guidelines calculation. But he argues that the district court's conversion of $4,825 in cash to actual methamphetamine was clearly erroneous. He contends that the PSR should have used fentanyl, heroin, or a mixture of methamphetamine, rather than actual methamphetamine, for the appropriate converted drug. We review the district court's factual determination of the drug quantity for clear error. *United States v. McReynolds*, 69 F.4th 326, 331-32 (6th Cir. 2023).

To determine the base offense level for drug crimes, the guidelines instruct district courts to identify the quantity of drugs involved. *See* U.S.S.G. §2D1.1(a)(5), (c). "The greater the quantity, the greater the sentence." *United States v. Crowe*, Case No. 22-6046, 2023 WL 4586154, at *6 (6th Cir. July 18, 2023). To calculate drug quantity "[w]here . . . the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled

substance." U.S.S.G. §2D1.1 cmt. n.5. In making this approximation, the court "may consider, for example, the price generally obtained for the controlled substance, financial or other records, [and] similar transactions in controlled substances by the defendant." *Id.* The evidence that the district court relies on to support the estimate must have a "minimal level of reliability," and the district court should "err on the side of caution" when the exact drug weight for which a defendant is responsible is not certain. *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004); *see also United States v. Johnson*, 732 F.3d 577, 581 (6th Cir. 2013).

"Seized funds can be converted into an equivalent amount of drugs." *United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010). The amount of money attributable to drug activity and conversion ratio—the price-per-unit of the drugs—must be established by a preponderance of the evidence. *See id.*; *United States v. Warman*, 578 F.3d 320, 351 (6th Cir. 2009). "A court's approximation of the amount of drugs involved in a particular case is not clearly erroneous if supported by 'competent evidence in the record.'" *United States v. Mahaffey*, 53 F.3d 128, 132 (6th Cir. 1995) (quoting *United States v. Brannon*, 7 F.3d 516, 520 (6th Cir. 1993)).

Terrance argues that the district court was wrong to assume that the ratio of drugs seized during the search of the Hazard house represented the ratio of drugs involved in the ongoing conspiracy. In particular, he argues that no evidence supports the district court's conversion of the cash seized from the Hazard house in proportion to the amount of actual methamphetamine seized at the same time. Rather, Terrance argues that he and Ellis Hull had been under investigation for dealing only heroin and fentanyl, as corroborated by a confidential source; the one controlled buy in January 2023 was for fentanyl; and that, when he was arrested, he was in possession of only fentanyl.

The district court's determination here was plausible and based upon competent evidence. To begin, when investigators performed the trash pull at the Hazard house, they recovered, among other things, a large food saver bag containing methamphetamine residue and an empty box of sandwich bags. When they searched the house a few days later, investigators found a sandwich bag containing multiple smaller, knotted bags of individually packed drugs, including 5.53 grams of pure methamphetamine in Terrance's pocket. They also found three separate knotted bags, each of which contained four additional bags of methamphetamine, totaling 311.7 grams of pure methamphetamine. Terrance admitted that he jointly possessed with intent to distribute methamphetamine found in the residence, except for the methamphetamine found in the mini-bedroom, including baggies individually packed for distribution. There was ample evidence in the record, however it may have come to investigators' attention, that Terrance and his co-conspirators were dealing in methamphetamine.

Terrance cites no authority for the proposition that a district court must have evidence of actual sales to justify the conversion of cash to drug weights in the ratio of drugs seized during a search. Nor are we aware of any. Darnell, in his briefing on this issue, cites *United States v. Frazier*, 89 F.3d 1501, 1506 (11th Cir. 1996), for the proposition that "extrapolation of drug quantities from general evidence of selling quantities and periods of time is insufficient for sentencing without more specific evidence of the number of transactions and quantities of drugs involved." No. 24-1427, CA6 R. 15, D. Moore Br., at 19. But *Frazier* did not concern the conversion of cash seized into drug weights. Darnell also cites *United States v. Lucio*, 985 F.3d 482, 488 (5th Cir. 2021), for the proposition that the government here had to establish a "plausible and reliable basis for connecting the money to a relevant drug sale." *Id.* at 20. But this quotation does not appear in the *Lucio* decision, and, in any event, the facts of that case do not track the facts

14

of this case. In *Lucio*, the district court converted $18,368 in seized cash entirely to methamphetamine, instead of converting a portion of it to cocaine and marijuana that were also seized in a search, because the evidence showed that the defendant was engaged only in methamphetamine trafficking. 985 F.3d at 488. Here, evidence provided to the district court of the defendants' methamphetamine-related activities provided a plausible basis for its conversion of the cash.

We have affirmed a sentence where the defendant contended that the district court's conversion ratio should have been based on quantities of drugs purchased in controlled buys, because the samples from the controlled buys were "not necessarily representative" of the defendant's total drug activity. *United States v. Gilliam-French*, 692 F. App'x 270, 272-74 (6th Cir. 2017). The district court here acknowledged that "[t]here is certainly evidence that there were other different drugs that [Terrance] trafficked in the past." RE 143, T. Moore Sent. Tr., at PageID 870. But it reasoned that it would be "speculative" to convert the cash to those "different drugs . . . trafficked in the past," "in that whatever he did before should be somehow translated into what he's doing now, compared to what was actually seized." *Id.* The district court found the proposed conversion in the PSR to be "proper in that it addresses what was actually seized and that was tested and the purity was tested and revealed to be pure meth." *Id.* This finding was reasonable and based on a plausible view of the evidence.

Terrance also contends that there was little evidence to show the cash was drug trafficking proceedings because the cash was located away from the controlled substances found in his bedroom. But he does not dispute that he admitted in his plea agreement that the cash seized would be forfeited *as proceeds of* his illegal activity.

15

Finally, Terrance argues that the district court did not "err on the side of caution" or articulate its methodology. He contends that the court should have converted the cash as if the methamphetamine seized at the Hazard house was not pure methamphetamine, because none of the methamphetamine sold by the conspirators prior to the search of the home had been determined to be pure methamphetamine. But there was no evidence before the district court that Terrance was selling a methamphetamine mixture. Rather, the evidence demonstrated that the methamphetamine seized from the stash house tested as pure. The district court properly reasoned that "this case is different in the sense that there isn't necessarily this mixture. We have actual meth that was seized. It was tested, all of it. It all came back pure, and that's what's converted." RE 143, T. Moore Sent. Tr., at PageID869-70.

In addition, the PSR noted that, at the time of the search, pure methamphetamine was selling for between $175 and $250 an ounce. The currency was converted to pure methamphetamine at the higher price, $250, a more conservative conversion rate. The district court thus erred on the side of caution. And the district court's explanation of how it arrived at the final estimated drug quantity, set forth above, articulated its methodology. We have previously affirmed district courts' drug-quantity determinations based on similarly ascertainable methodologies. *See, e.g.*, *United States v. Murillo-Almarez*, 602 F. App'x 307, 311 (6th Cir. 2015) (affirming the district court's calculation of "the amount [of heroin] involved by dividing the total amount of money recovered in connection with the conspiracy by the typical street price per gram of heroin").

Overall, the district court's cash-to-actual methamphetamine conversion was plausible in light of the evidence of the scope of the drug conspiracy, the drugs seized, and the purity of the drugs. Thus, the district court's factual findings were not clearly erroneous.

16

2.      Leadership Enhancement

Terrance next argues that he should not have received a leadership-role enhancement under U.S.S.G. §3B1.1(c). That enhancement applies where a defendant "was an organizer, leader, manager, or supervisor in any criminal activity" of fewer than five participants, which was not otherwise extensive in its scope. U.S.S.G. §3B1.1(c). In applying this enhancement, courts "should consider . . . the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. §3B1.1 cmt. n.4. Whether a person is an organizer or leader under §3B1.1 "depends on a number of factual nuances that a district court is better positioned to evaluate." *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013). We therefore review a district court's factual findings underlying a §3B1.1 enhancement for clear error, and review deferentially its legal conclusion that a person is an organizer or leader. *United States v. Robinson*, 813 F.3d 251, 262 (6th Cir. 2016) (citing *Washington*, 715 F.3d at 982-83).

Terrance argues that he was an equal participant in the conspiracy, not a leader. He points to the shared "dope phone" and the fact that he and his co-defendants all shared the same stash house to disavow a leadership role. We disagree. The district court properly found that Terrance rented the residence that served as a "hub of . . . activity" for the conspiracy. And Terrance engaged in multiple electronic-message exchanges demonstrating his leadership and authority over the conspiracy and his co-conspirators. For example, in January and February of 2023,[3] messages left

---

[3] Other messages detailed in the PSR pre-date the charged dates of the conspiracy, but likewise show that customers understood Terrance Moore to be the leader of the drug operation.

on the shared "dope phone" specifically requested that Terrance be notified that a customer's payment was delayed and that someone have Terrance call her back. A message sent to Darnell through Facebook Messenger asked Darnell to ask "[S]coot" (Terrance) for his lowest price on drugs; Darnell deferred and told the customer to contact Terrance for this information. A message sent from Hull to Darnell complained that "[S]cooter" had a customer waiting, whom Terrance expected Hull to assist. And still other messages show Darnell communicating with a customer on Terrance's behalf, explaining when to pick up drugs.

Terrance argues that these messages simply reflect a "coordinated effort to make drug sales as a group" and that "beyond the[se] messages," "[t]here was no [other] testimony or evidence that [he] exercised decision making authority." We see the messages differently. They show an individual exerting control over acceptance of transactions, the pricing of drugs, and his co-conspirators' interactions with customers about their drug purchases. Coupled with Terrance's control over the Hazard house, which served as the organizing hub of the drug operations, these facts point to Terrance taking a leadership role. We cannot say that the district court erred, clearly or otherwise, in concluding that he was the leader or organizer of the conspiracy. *See Washington*, 715 F.3d at 984.

### 3. Substantive Reasonableness

Finally, Terrance contends that his sentence was substantively unreasonable. Such a claim asserts that the district court unreasonably weighed the factors in 18 U.S.C. § 3553(a), resulting in a sentence that is too long. *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019). We review for abuse of discretion and presume that a sentence within the guidelines range is reasonable. *United States v. Jones*, 81 F.4th 591, 602 (6th Cir. 2023).

Terrance argues that the district court over-emphasized the need for deterrence during sentencing. The record demonstrates otherwise. Before sentencing Terrance, the district court described the seriousness of the offense and his criminal history. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A). The court considered Terrance's risk to the public and the sentence's effect on deterrence and rehabilitation. *See id.* § 3553(a)(2)(B)-(D). The court also reviewed the guidelines range and the need for consistency. *See id.* § 3553(a)(3)-(4), (a)(6). And the court looked at mitigating factors, *see id.* § 3553(b)(1), noting that Terrance had a traumatic and unstable childhood but had been involved in the lives of his six children. In the end, the district court declined to vary downward and imposed a sentence at the low end of Terrance's guidelines range.

All of this was within the court's discretion. True, the court devoted ample time to discussing Terrance's criminal history, including past drug offenses, domestic violence, and firearms violations, and noted that the sentences that he had received for those offenses had not deterred him from further criminal behavior. But the court also relied on mitigating factors in sentencing Terrance to the low end of his guidelines range. Terrance's claim boils down to an argument that "the district court should have balanced the § 3553(a) factors differently." *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008). That argument is beyond our abuse-of-discretion review. *Id.*

Terrance also argues that disparity between pure methamphetamine and methamphetamine mixture had a significant impact on his sentence because the district court converted the majority of the seized cash to pure methamphetamine, and that the district court did not address this disparity at sentencing. But the district court understood and directly addressed this issue: "I realize that you are being held accountable for actual meth, not a mixture, that there is a difference. I don't have any policy disagreements with that and the assessment of the difference. And I think

that reflects on the seriousness of the offense . . . ." RE 143, T. Moore Sent. Tr., at PageID 891-92.

Finally, Terrance contends that the disparity between his sentence and Hull's sentence demonstrates that his sentence is unreasonable. But the two defendants had different criminal records, different offense conduct, and different sentence enhancements, which resulted in different advisory guidelines ranges and different sentence selections for each. And the district court sentenced all three defendants to the low end of their respective guidelines ranges. We cannot discern any abuse of discretion in that reasoning, especially given the general rule that a within-guidelines sentence is presumptively reasonable. *See Jones*, 81 F.4th at 602.

We hold that Terrance's sentence of 262 months' imprisonment is substantively reasonable.

## B. Darnell Moore

Darnell raises two issues: (1) whether the district court erred in applying a two-level enhancement of his base offense level for possession of a firearm during the commission of a drug offense, either because the court failed to resolve his objection to the firearm enhancement or because it improperly shifted to him the burden of proof for application of the enhancement; and (2) whether the district court erred in converting the cash seized during the execution of the search warrant to pure methamphetamine.

### 1. Firearm Enhancement

Darnell contends that the district court violated Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure when it adopted the PSR's recommendation to enhance his base offense level by two levels for possession of a firearm during a drug trafficking crime under U.S.S.G. §2D1.1(b)(1). He also argues that the district court failed to hold the government to its burden to

prove, by a preponderance of the evidence, that he possessed the weapon during the commission of the offense, and improperly shifted the burden to him to prove that it was not.

The parties agree that Darnell did not raise his argument regarding Rule 32 below and that plain error review therefore applies. "To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006) (quoting *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)).

"A district court's determination that the defendant possessed a firearm during a drug offense is a factual finding that this court reviews under the clearly erroneous standard."[4] *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008) (citing *United States v. Darwich*, 337 F.3d 645, 664 (6th Cir. 2003)). Under the clear-error standard, "a reviewing court must ask whether on the entire evidence it is left with the definite and firm conviction that a mistake has been committed." *United States v. Wilson*, 75 F.4th 633, 636 (6th Cir. 2023) (quoting *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020)).

### a. Federal Rule of Criminal Procedure 32(i)(3)(B)

Darnell argues that the district court failed to resolve his objection to the firearm enhancement under Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure. That rule states: "At sentencing, the court . . . must—for any disputed portion of the presentence report or other

---

[4] The government contends that Darnell concedes on appeal that he did not preserve his improper-burden-shifting challenge in the district court, so plain error applies. We read Darnell's brief as conceding that plain error applies to his Rule 32 argument, but not conceding that plain error applies to his burden-shifting challenge. Below, Darnell objected to the application of the firearm enhancement, raised the issue of improper burden-shifting at sentencing, and argued that Terrance's possession of firearms was not reasonably foreseeable to him. We therefore review the decision to apply the two-level enhancement for clear error.

controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). Darnell argues that the district court failed to follow this rule by "summarily adopting" the PSR report.

The district court did not violate Rule 32 here. Darnell objected below to the two-point enhancement on the ground that "it was not foreseeable to [him] nor is there any evidence . . . that a co-defendant would possess firearms or that the firearms were connected to the instant offense for the enhancement to apply." RE 96, D. Moore Objs. to PSR. He also argued that the government could not establish that he possessed a firearm or that it was reasonably foreseeable to him that Terrance possessed firearms. So, Darnell attacked the government's evidence and asserted that it was insufficient, but he put forth no evidence of his own.

We have previously concluded that, to put an issue "in dispute" at sentencing, a "defendant who challenges factual allegations in the PSR . . . has the burden of producing some evidence beyond a bare denial that calls the reliability or correctness of the alleged facts into question." *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003) (citation omitted). To illustrate, in *Lang*, a defendant failed to produce any evidence supporting her argument, such as an affidavit contradicting the PSR's findings, or testimony at sentencing, and instead pointed only to "her attorney's unsupported letter" contesting a fact and denying the applicability of a guideline. *Id.* at 682. The district court in that case could properly rely on the facts in the PSR "to evaluate the propriety of the enhancement." *Id.* The same is true here. Darnell relied only on his attorney's written and oral objections to the PSR report, but not on any evidence, such as an affidavit or testimony, supporting his "bare denial." *Id.* at 681. He puts forth no evidence on appeal, either, contending only that "the government did not

allege that any co-defendant possessed either firearm during the commission of . . . controlled buys attributed to Terrance Moore and Ellis Hull." No. 24-1427, CA6 R. 15, D. Moore Br., at 16.

In any event, the district court properly considered the parties' arguments and the undisputed facts before applying the enhancement. The court found that Terrance's firearms were "found in the home [and] in a vehicle," that Terrance had "pos[ed for photographs] with weapons . . . [and] some of those photos [were taken] in common areas of the home," and that Darnell had "unfettered access to that home." RE 141, D. Moore Sent. Tr., at PageID 801. The court also found that Darnell, during the scope of the conspiracy, had sent a Facebook message to his sister saying, "I need my gun," and the person who responded pointed him to the location of the gun. *Id.* at PageID 800. The district court reasonably found that Darnell's "own statement" implied that he "was in possession or came to possess a weapon" during the conspiracy. *Id.* at PageID 801. We find no error, much less one that is plain, in the district court's fact-finding at Darnell's sentencing. *See, e.g.*, *United States v. Mack*, 817 F. App'x 176, 178 (6th Cir. 2020).

b.  Burden-Shifting Under U.S.S.G. §2D1.1(b)(1)

Section 2D1.1(b)(1) of the guidelines instructs a district court to add two levels to a defendant's base offense level if "a dangerous weapon (including a firearm) was possessed" during a specified drug trafficking crime. The commentary to that guideline explains that the enhancement "reflects the increased danger of violence when drug traffickers possess weapons," and directs district courts to apply the enhancement "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. §2D1.1 cmt. n.11(A).

Darnell contends that he disputed the application of the enhancement in both his written objections and sentencing memorandum (No. 24-1427, CA6 R. 15, D. Moore Br., at 11), but the district court "treated the dispute as if the burden had already shifted to [him] prior to the

sentencing hearing" (*id.* at 14). He relies on the following exchange between his counsel and the court at sentencing:

> THE COURT: Okay. So, Mr. Martinez, let's start with objection number one, which is you're objecting to Mr. Darnell Moore being held responsible for two firearms possessed by Mr. Terrance Moore. And, I guess, I'll hear argument as it relates to that.
>
> [DEFENSE COUNSEL]: As indicated in my sentencing memorandum, Your Honor, there is no correlation or evidence that Mr. -- or Darnell Moore knew that Terrance Moore had the guns or had the guns in conjunction with the conspiracy. There is a text message that was sent or a Facebook message that was sent to his sister, my client's sister, saying, hey, where is -- I need -- I think -- I quoted it in my sentencing memorandum. It says, Yelle, I need my gun. Nothing to do with the drug conspiracy, and it's –
>
> THE COURT: How do I know that?
>
> [DEFENSE COUNSEL]: **Well, it's actually the government's burden to prove that it was connected to the conspiracy.**
>
> THE COURT: Well, I'm asking you, how do I know it's not? You're saying it's not. What is it –

No. 24-1427, CA6 R. 15, D. Moore Br., at 14-15 (citing RE 141, D. Moore Sent. Tr., at PageID 792-93) (emphasis added).

We do not read this exchange as improperly shifting the burden to Darnell. To obtain an enhancement under §2D1.1(b)(1), the government must first establish, by a preponderance of the evidence, that "(1) the defendant actually or constructively 'possessed' the weapon, and (2) such possession was during the commission of the offense" or during relevant conduct to the offense. *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)); *see United States v. Rios*, 830 F.3d 403, 437-38 (6th Cir. 2016) (citing *United States v. Penaloza*, 648 F. App'x 508, 518 (6th Cir. 2016)). To show that possession by one co-conspirator is attributable to another through relevant conduct, the government must prove by a preponderance of the evidence that it was reasonably foreseeable to the defendant that his co-conspirator would possess a firearm. *United States v. Woods*, 604 F.3d 286, 290 (6th Cir. 2010).

Here, the district court heard argument from the government on its burden following the above exchange. "Once the government meets its burden of showing that the defendant possessed a weapon, a presumption arises that 'the weapon was connected to the offense.'" *Darwich*, 337 F.3d at 665 (quoting *United States v. Hough*, 276 F.3d 884, 894 (6th Cir. 2002)).

Then, to rebut this presumption, the defendant must demonstrate that it was "'clearly improbable' that the weapon was *connected to* the offense." *Catalan*, 499 F.3d at 606 (quoting *Hill*, 79 F.3d at 1485) (emphasis added). Here, defense counsel incorrectly stated that the government had the burden to prove that the weapon was connected to the conspiracy. Instead, Darnell bore the burden of coming forward with "evidence, not mere argument" on whether the connection was clearly improbable. *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012), *abrogated on other grounds by New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Indeed, the district court properly invited counsel to come forth with evidence that the weapon was possessed for a reason unconnected to the offense—which was defendant's burden to bear.

The sentencing hearing transcript confirms that the district court did not improperly shift burdens. The court applied the firearm enhancement on two different grounds: that Darnell had possessed his own gun during a drug trafficking offense,[5] and that it was reasonably foreseeable to him that Terrance would have possessed firearms during the offense.

With respect to Darnell's own gun, the government presented evidence of a text message that Darnell had sent to his sister, Yelle, in January 2023, which read, "Yelle, I need my gun." RE 141, D. Moore Sent. Tr., at PageID 796. The person responding to that message told him where

---

[5] The government contends that Darnell did not appeal the district court's substantive finding that he possessed his own gun during the drug conspiracy. It is true that Darnell's arguments on appeal largely concern his objections to basing the enhancement on Terrance's firearms. But he quotes a portion of the sentencing hearing transcript that refers to his own gun and arguably raises a challenge to that finding on appeal.

the gun was located. And with respect to Terrance Moore, the government presented evidence that Terrance's cell phone seized during the home search contained photographs of him posing with guns in a common area of the house, that Darnell had unfettered access to the home, and that at least one of Terrance's firearms was found out in the open inside the home. The other firearm was found in Terrance's rental car. The district court therefore found that the government had carried its burden.

The district court also considered whether it was "clearly improbable" that the firearms were possessed in connection with Darnell's drug trafficking. It heard argument from counsel that Darnell's sister lived outside of Kalamazoo, and there was no evidence that he possessed his own gun when he asked her where it was. His counsel also argued that Terrance's guns could not be tied to the conspiracy because there was no evidence that a drug deal occurred on the day the gun was seized during the search. Counsel did not dispute that the text messages with Yelle concerning the location of Darnell gun occurred while Darnell was participating in the drug conspiracy.

For its part, the government presented evidence that, a week and a half after texting his sister, authorities issued an arrest warrant for Darnell for a homicide involving a firearm. The government argued that the gun could be possessed both to commit a homicide and protect the drug trade. It also argued that drug dealers need firearms to protect their drug-trafficking activities, and thus it was reasonably foreseeable to Darnell that Terrance would possess firearms in the house. The district court considered these arguments and overruled Darnell's objection: "[T]here is an indication that he was in possession or came to possess a weapon. Certainly his own statement indicates that. It's not—I don't know that it's clearly improbable that the weapon was connected with the offense." RE 141, D. Moore Hrg. Tr., at PageID 801. The court also stated that, given Darnell's "access to [the] home, [and] the evidence that . . . those firearms were clearly

26

displayed within the common areas of the residence," it was "reasonably foreseeable" to Darnell that his "co-conspirator would possess a firearm to protect proceeds of the sales." *Id.* at 802.

Darnell cites *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994), in arguing that the government could not meet its burden of showing that Terrance's possession of firearms was reasonably foreseeable to him. In *Cochran*, we held that a firearm possessed by a drug-trafficking co-conspirator, hidden under his car seat, was not known or reasonably probable to the defendant, where the defendant testified that he considered the co-conspirator to be "small time," and it had never occurred to him that his co-conspirator would resort to violence to protect his drug operation. *Id.* at 1132-33. But in the present case, Terrance's guns were out in the open at the residence. Additionally, the Hazard house was used as a stash house, and firearms were reasonably likely to have protected the numerous drug-trafficking activities that occurred there.

In short, the district court did not engage in improper burden-shifting. The facts presented to the district court gave rise to a presumption that one or more weapons were connected to the offense, *see Darwich*, 337 F.3d at 665, and Darnell has failed to demonstrate that it was "clearly improbable" the weapons were connected to the crime. *See Catalan*, 499 F.3d at 606; *cf.* U.S.S.G. §2D1.1 cmt. n.11(A) (describing a situation in which a defendant had an "unloaded hunting rifle in the closet" as one where it would be "clearly improbable" that the weapon was connected to the offense). The district court did not err in applying the two-level firearm enhancement under U.S.S.G. §2D1.1(b)(1).

### 2. Conversion of Cash to Pure Methamphetamine

Darnell next argues that the district court erred in adopting the drug calculation in the PSR report. First, he argues the district court improperly converted the seized cash based on pure

methamphetamine. Second, he argues the district court improperly attributed that amount to him because it reflected drug sales outside the scope of his plea agreement.

At sentencing, the district court recognized Darnell's objection to "conversion drug weight" or "currency conversion" and invited argument on that issue. RE 141, D. Moore Sent. Tr., at PageID 808. Darnell's counsel recognized that the "amended conversion" in the supplemental memorandum, filed the day before, "didn't change the guidelines." *Id.* at PageID 810. The only objection Darnell raised with respect to the currency-to-drug conversion was to the purity of the methamphetamine seized. The government then directed the court to the PSR, which explained that all the methamphetamine tested as pure in a DEA laboratory. Darnell raised no other objections on this topic. Because Darnell did not preserve the arguments he now raises on appeal, we review the district court's determinations for plain error. *See Gardiner*, 463 F.3d at 459.

There was no plain error here. First, the district court did not err in converting the seized cash to pure methamphetamine. Darnell makes essentially the same arguments that Terrance makes on this point. As set forth above in Part II.A.1., however, the district court appropriately held that the ratio of drugs seized from the Hazard house was a plausible conversion ratio for the $4,825 seized during that search, especially given evidence that the conspiracy was also trafficking in methamphetamine.

Next, the district court did not plainly err in attributing the seized cash to Darnell as part of his relevant conduct. Section 1B1.3(a)(1)(B) of the guidelines defines relevant conduct, in the case of "jointly undertaken criminal activity," to include "all acts and omissions of others that were . . . (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."

Darnell argues that the cash seized from Terrance's bedroom derived from sales of drugs that were not "within the scope of [his criminal] agreement." No. 24-1427, CA6 R. 15, D. Moore Br., at 21. He contends that, in order to hold him accountable for the acts of his co-conspirators, the district court was required to make particularized findings that the drug sales that produced the cash were within the scope of his agreement and foreseeable to him.

The government, citing *United States v. Donohue*, 726 F. App'x 333, 359 (6th Cir. 2018), justifiably points out that Darnell did not object to these findings at sentencing, so the district court cannot have plainly erred in failing to make particularized findings. In *Donohue*, the defendant argued that the district court should have made particularized findings regarding his individual accountability for the loss stemming from an investment fraud scheme. 726 F. App'x at 358. Yet the *Donohue* defendant did "not request clarified findings or object to the lack of particularized findings on the loss-amount calculation" at sentencing. *Id.* We found no plain error, as "the district court cannot be deemed derelict in having countenanced the unobjected-to lack of particularized findings." *Id.* at 359 (citing *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011)).

So too here. When asked at the conclusion of sentencing whether there were "[a]ny legal objections, other than the objections as it relates to the scoring that have already been noted for the record," Darnell's counsel replied "[n]o." RE 141, D. Moore Sent. Tr., at PageID 832. "Yet, if the district court misunderstood the nature of [the defendant's] objection . . . this was the moment when counsel could be expected to speak up. He did not." *Donohue*, 726 F. App'x at 358.

In any event, the district court did not plainly err in treating the cash seized from the house on Hazard as relevant conduct for Darnell's sentencing.[6] Although the commentary to §1B1.3

---

[6] Darnell also argues that "the district court did not say why it was holding [him] accountable for the higher amount than stipulated in his plea agreement, thereby increasing the low end of [his] advisory guideline range by

notes that "[a]cts of others that were not within the scope of the defendant's agreement . . . are not relevant conduct under subsection (a)(1)(B)," it also states that "[i]n cases involving contraband (including controlled substances), the scope of the jointly undertaken criminal activity . . . may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or a number of separate criminal activities." U.S.S.G. §1B1.3 cmt. n.3(B). The criminal activity here was a jointly shared undertaking between the three co-conspirators, who shared a phone, exchanged messages with customers on behalf of one another, and shared the same residence both for sleeping and as a hub for their common criminal activities. The district court was not wrong to conclude that the cash seized from the house on Hazard represented drug sales that could be attributed to Darnell as part of the scope of his criminal agreement.

Darnell has not shown plain error. We therefore affirm his 235-month sentence.

## C. Ellis Hull

Hull argues the district court unreasonably failed to address his schizophrenia diagnosis at sentencing. Where a defendant objects in the district court, we review claims of procedural and substantive unreasonableness for an abuse of discretion. *Jones*, 81 F.4th at 601. A sentence may be procedurally unreasonable "when the district court wholly fails to address legitimate mitigating arguments raised by the defendant." *United States v. Johns*, 65 F.4th 891, 893 (6th Cir. 2023)

---

approximately 4 years." No. 24-1427, CA6 R. 15, D. Moore Br., at 23. In his plea agreement, Darnell admitted to jointly possessing with intent to distribute the drugs seized from the residence, but not to any drugs found in Terrance's pockets or derived from the $4,825 that was seized. But he and the government did not come to any agreement on the total drug quantity for which he would be held accountable. That determination was reserved to the discretion of the district court, which could take relevant conduct into account in fashioning a sentence. *See United States v. Louchart*, 680 F.3d 635, 638 (6th Cir. 2012) ("[L]imiting the admission of facts from a guilty plea to . . . those explicitly admitted to by the defendant does not keep the government from supporting a sentence with related conduct.").

(internal quotation marks omitted). And, as we noted above, a substantive reasonableness argument is one that claims that a sentence is too long. *Parrish*, 915 F.3d at 1047.

The probation officer identified Hull's schizophrenia as a potential basis for departure under §§5H1.3 (mental and emotional condition) and 5K2.13 (diminished capacity) of the sentencing guidelines. She also identified his mental health issues and lack of stable housing as factors under § 3553(a) that could warrant a variance from the guidelines, because "Terrance Moore took advantage of [these] vulnerabilities." RE 101, Hull PSR, at PageID 563. At sentencing, Hull's attorney acknowledged that "the presentence writer essentially made a downward departure argument," but focused his own arguments on a variance. RE 144, Hull Sent. Tr., at PageID 925-27 ("I made an argument for variance. . . . And I think the Court ought to consider that. . . a significant variance would be appropriate."). The district court rejected both a downward departure and Hull's motion for a variance.

Hull makes a passing reference in his brief on appeal to the district court's denial of the downward departure. To the extent that Hull seeks review of the district court's decision not to depart under the guidelines, such a decision is generally not reviewable. *United States v. Coleman*, 188 F.3d 354, 357 (6th Cir. 1999) (en banc). We may review a denial of a motion for a downward departure only if the district court believes incorrectly that it lacks authority to consider the defendant's mitigating circumstances and lacks discretion to deviate from the guidelines. *Id.* The record in this case demonstrates that the district court was aware of the probation officer's recommendation for a departure but was simply "not convinced that there is a condition or combination of conditions that are present to an unusual degree" that would warrant a downward departure. RE 144, Hull Sent. Tr., at PageID 937-38. We therefore do not review its decision not to depart.

31

With respect to the district court's decision not to vary downward, that decision was both procedurally and substantively reasonable. The district court heard from both parties on Hull's mental health issues and the concern that his condition made him vulnerable to being "easily led." RE 144, Hull Sent. Tr., at PageID 928. It then weighed the § 3553(a) factors. The court first discussed the seriousness of the offense and the effect of Hull's drug trafficking activity on the community. It noted Hull's history of criminal activity. The court expressly acknowledged that, in fashioning the sentence, it was "looking at [Hull's] involvement and his participation," some of which "might have been at the direction of Terrance Moore." *Id.* at PageID 940. But the court nevertheless found that Hull "was involved in the distribution of . . . drugs," "made sales," "coordinated sales," and "delivered drugs"—in short, that he was "fully engaged in the operation." *Id.* at PageID 940-41. With respect to Hull's schizophrenia, the district court noted that it was not discounting that diagnosis, but that it "[didn't] really have much else . . . [and] nothing that indicates . . . that it's present to such an unusual degree that . . . distinguishes it from other . . . similar diagnoses." *Id.* at PageID 941. Notably, the court recommended that Hull receive mental health evaluation and treatment from the Bureau of Prisons.

In sum, the court considered and weighed Hull's mental health condition but declined to grant a variance from his within-guidelines sentence. That decision was within the court's discretion. *See United States v. Elliott*, 521 F. App'x 513, 520 (6th Cir. 2013) (finding sentence substantively reasonable where court weighed defendant's history of criminal offenses against his history of mental health disorders, including schizophrenia, and addressed both in pronouncing sentence); *United States v. Judge*, 649 F.3d 453, 458 (6th Cir. 2011) (noting that the "underlying inquiry" in a procedural-error claim that the district court did not explain its sentence, is "whether the record makes clear that the sentencing judge listened to each argument, considered the

supporting evidence, was fully aware of the defendant's circumstances[,] and took them into account in sentencing him" (quoting *United States v. Vonner*, 516 F.3d 382, 387 (6th Cir. 2008) (en banc)).

The district court committed no substantive or procedural error in denying Hull's motion for a downward variance based on his schizophrenia. We therefore affirm Hull's 168-month sentence.

## III.    Conclusion

For the foregoing reasons, we affirm the defendants' sentences.